The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Be seated. I want to welcome everyone to the Fourth Circuit Court of Appeals this morning. Not only the Learned Counsel, but also 30-some students from West Point High School here in Virginia near Richmond. It's really nice to have you all and you've picked out, I think, some interesting cases to hear this morning. Our first case is number 17, 2220 Feminist Majority Foundation v. Hurley. Professor Termanensky. Good to have you here, sir. Good morning. May it please the Court. My name is Erwin Termanensky. I represent the plaintiff's appellants, seldom in the courtroom today. This case poses a profoundly important question about the obligation of a university under Title IX in equal protection to protect its students from the subjected to harassment and threats. There is no doubt, based on the allegation of the complaints, that these women were subjected to threats of rape and murder, as well as harassment. In fact, a university official described what they were subjected to as cyber-bullying. The first issue before the Court is whether the District Court erred in dismissing the claim for deliberate indifference under Title IX. The United States Supreme Court in Davis-Monroe County said clearly that if a university or school at any level does not respond to complaints of harassment, when it is knowledge, that's deliberate indifference. This Court in SBXLAL v. Hartford County School Board said that if a school takes some actions, but it proves ineffective in dealing with harassment, that they don't take further actions, that constitutes deliberate indifference. What's important to note here is that the school did virtually nothing in response to the repeated complaints. It's not really a fair characterization when you read your complaint, but we are bound by the complaint here. And the university seemed to do, by your own pleading, quite a number of things. And they had assemblies, they sent out campus-wide emails, they offered police assistance, they had forums, they canned the rugby team and forced them to go to mandatory training. I mean, it's just hard for me to see that you could say that, having read the allegations in your own complaint. Yes, Your Honor, it is a fair characterization. To begin with, on March 27th, the Title IX officer, Dr. Cox, sent a campus-wide email saying the campus was powerless to deal with, quote, such cyberbullying. On April 1st, another email was sent out saying that since the speech protected by the First Amendment, they could do nothing. I'd like to address each of the things you point to. Well, the Supreme Court in Davis seemed to set fairly high bars here in terms of deliberate indifference. And they also were very clear in saying that, particularly I think in a university setting, that where the university or the educational institution has a threat of constitutional litigation over a response that a litigant wishes to take, that that's a legitimate reason not to proceed with certain actions. As to the latter, I want to list for you the many things that the university could have and should have done that wouldn't implicate the First Amendment at all. But let me go back to the initial part of your question, where you list the things that the university did. Because I think when you look at them, you'll see that these would not begin to count as sufficient action under Davis, under the circuit's precedent. For example, what the campus did was send out the announcements I said, saying it couldn't do anything. The campus said that the students could file complaints with the platform Yik Yak. A professor organized sharing circles where the students could talk about their feelings. On one instance, the campus sent a police officer. In terms of suspending the rugby team, that happened early on before the vast majority of this harassment, these threats occurred. In fact, that's what precipitated a great deal of the harassment threats. That's it, Your Honor. Under Davis, the educational institution has to have control not only of the harasser, which in this case you have no idea who it is, and you have to have control over the context. And this Yik Yak thing isn't anything that the university controls, owns. It's not a university function. Your Honor, I am not suggesting that the campus should have done anything as to Yik Yak. That's a separate question that we can discuss. Well, your complaint says in several places that they should. They should have closed Yik Yak down on the campus. No, Your Honor. The students asked the campus to close down Yik Yak. I do think the campus should have investigated that possibility. But I think key to answering your question— That was asked before they filed the complaint. That's correct, Your Honor. And that request is quoted in the complaint.  In the recitation of the facts. That's correct, Your Honor. You asked for that in paragraph 90 of your complaint. And I think one of the things the campus should have considered was the possibility of closing Yik Yak. It is unclear under current First Amendment law whether the campus had that power. But the point I was trying to make in response to your question, and also in response to your question, Judge King, are the many things that the campus could have and should have done under Office of Civil Rights and Department of Education guidelines that wouldn't implicate the First Amendment at all. Well, threats to hurt somebody aren't protected by the First Amendment. Exactly, Your Honor. I mean, we've got—the rest of the year, I have been involved in one of them. Involved with the University of Virginia president, I think, who was prosecuted under 875. And we resigned the proposition. They said the First Amendment protected what the allegations would be. They said threats to do personal harm are not protected by the First Amendment. That's exactly right. Now, here, that was not the context of Yik Yak or anything. It was communications mail. But I don't know if there's any material difference here between what we have now with the modern conveniences of mailings. Exactly. There is no difference based on the medium of communication. The fact that it's over cyberspace doesn't give the university a pass. What I think is key, as I was saying, are the many things that the campus could have and should have done that didn't implicate the First Amendment at all. First, campus officials should have issued a statement condemning the cyberbullying, the threats, and the harassment. Second, the campus should have— You say they didn't do that. I thought they sent out several emails that did. No, Your Honor. No, they never sent out an email condemning the threats or the harassment. In fact, if you look at the March 27, 2015 statement, it said they're powerless to deal with cyberbullying. If you look at the April 1 statement, it specifically said, this is speech under the First Amendment. Also, Your Honor, what they could have done is seek to investigate who was making these threats and this harassment, find the identity and discipline of the students. To go to Judge King's point, if these were bomb threats, whether by this medium or any other, the campus would have taken the steps to find out who was making the threats. They didn't just sit here. Third, the campus— I'm sorry. I just want to ask you a question about the structure of your argument. You're talking about the deliberate indifference. Yes. But you agree, don't you, with the school that the control inquiry is sort of the threshold, that if there's no control over the context or the perpetrators, then it doesn't even matter if the school is deliberately indifferent. The key is control over the perpetrators or the context. I just want to make sure. Yes. So the idea is that if there's no control here, that's just like a safe harbor. There can be no liability under Title IX on the school's theory for any kind of cyber harassment because they don't control Yik Yak, so they could have been deliberately indifferent, and it wouldn't matter. Not when you phrase it that way, Your Honor. The key is they have the obligation when there's peer-on-peer sexual harassment to take actions even if they couldn't control Yik Yak. But under Davis, I think you probably agree with me, but I want to make sure we're all clear on the structure of the argument here. Under Davis, if the school doesn't have control over the students or the context, then there is no obligation not to be deliberately indifferent. That's correct. But here my argument is the school had control over both the students and the context. So just in the context over which the school had control, as you define it, that would be the school environment where these women are walking around, feeling threatened, feeling harassed. The context is the school itself. Yes, Your Honor. So that's why the school had the obligation in that context to issue a statement condemning the harassment. And then whether or not the school can shut down Yik Yak, what the school can do, that would be something we would consider over when we're thinking about were they deliberately indifferent, did they do what was reasonably available. And my only point as to Yik Yak is that's something they could have explored. The First Amendment is unclear there. That they could have identified who were the students who were making the threats. That's control. How are they supposed to do that? I mean, this is anonymous. You don't know who they are. But, Your Honor, we know when there have been bomb threats, schools have been able to find out from Yik Yak who was the ones who were making the threats. This should be treated no differently. Or another example, and this goes to the judge. A crime is a crime. If they have a crime that occurs, they have to act reasonably to try to identify the perpetrator. That's correct. Whether it's a threat or a threat against one of their students. That's exactly right, Your Honor. And it's deliberately indifferent to not take action. And this goes, Judge Harris, to your point of the control over the students was there. Or at the very least in terms of context, the school had a responsibility to counseling to these students. The school had the obligation to provide training to faculty, administrators, and students. The school had the control over the context with regard to issuing a cyber-bullying policy. They did none of these, even in the face of threats, even in the face of harassment, even in the face of notice that was interfering with the students' educational opportunities.  There's a letter. I don't know whether it's a letter. The letter is not in the complaint, but it's referred to, and whether it's considered an audible district or not. But the letter refers to a resident, a lawyer. Does that protect them at all? The question is, were they deliberately indifferent? I'll go back to this court's case in SBXLAL versus Hartford County School District. It says, if a school begins to take actions and the harassment remains unchecked, there's deliberate indifference if the school doesn't take further action. Advice of counsel doesn't provide an excuse for not doing the basic things. As I said to Judge- Well, the advice of counsel can show that you acted in good faith. It can, for sure. In the context of qualified- You acted prudently. Potentially, in the context of qualified immunity, the law is very clear that advice of counsel is a factor to be taken into account, but it's not determinative. I don't think it should be any different here. I think what you need to do as a court is look at the things that the campus did, which, as I said, is virtually nothing, and compare it to what it should have done under OCR guidelines, and that's the deliberate indifference. The second question that's before the court is whether- The educational institution knows who the harasser is. They can see that. They know the context. It's some university function or some university related. It's a team. It's a fraternity. It's something of that nature. You don't have any of that here. Your Honor, none of that is required. Think of the steps that the campus should have taken. Publicly condemn the harassment and threats. Provide counseling to the students. Provide training. Wait a minute. You say your complaint doesn't contain those allegations that they did condemn cyberbullying. I'm sorry. I don't understand the question. The question is, when you read your complaint, there are places where you appear to say that the university did condemn cyberbullying. They just didn't do it in the terms that you prefer they would have. No, Your Honor. That's not what we're saying. I again direct you to the March 27, 2015 statement by Dr. Cox where she said, the campus is powerless, quote, to deal with such cyberbullying. I direct you to the April. The university has no recourse for such cyberbullying. Exactly. Is what Mrs. Cox. She's the Title IX coordinator on campus. And if you look at the April 1 statement, they said, we can't deal with this because this is all speech under the First Amendment. That, I think, is the answer to J.G.'s question. And that's what shows, to go to your question, Judge Harris, the deliberate indifference in this context. There is a second issue that's presented. It's whether the district court erred. Paragraph 41. Defendant Hurley, the president, sent an email to the student body generally discussing the university's efforts to end sexual assault, violence against women, and other forms of discrimination and harassment that prevail in our society. And that he found the behaviors that had been going on, quote, repugnant and highly offensive to members of our community. But at no point did that statement condemn the cyberbullying, the harassment and the threats that these students suffered. As Judge King just read, instead what the campus said is, we're powerless to deal with this cyberbullying. As I said, I can list the things that the Office of Civil Rights says that a school should do. And it didn't do any of these, even in the face of repeated claims by these students that their educational opportunities were being undermined and interfered with. The second issue is whether the district court erred in dismissing the claim with regard to retaliation. And here the law is clear that retaliation is a basis for a claim under both Title IX and under equal protection. And peer-on-peer sexual harassment can be the basis for a claim so long as the campus is deliberately indifferent. And again, this goes to our argument that there was such deliberate indifference here. Is there any sense in which that claim doesn't just merge into your Title IX discrimination claim? I don't understand. If it's the same behavior that you're pointing to both times, what does the retaliation claim add? Ultimately it comes down to whether there was deliberate indifference. The only thing that's added here is there's also the part of the retaliation argument as to whether or not Dr. Hurley's statement in response to the students counts as retaliation. And how can it be that a school or an employer's denial of a complaint of discrimination itself counts as an adverse action? I don't think the denial by itself does. I think the question, though, is whether or not his criticism of the students was an embarrassment that counts as retaliation. It does sort of seem as though any time a school or an employer is saying there's been this complaint and that's not true, it's sort of implicit in that that the person who's bringing the complaint is either lying or incorrect or irresponsibly brought a complaint. It seems as though this is going to cover a lot of ground. But there is an irony here, Judge Harris, that the president of the university felt completely comfortable speaking up to defend himself but never took the action to publicly condemn the harassment and threats, and that was at minimum what he should have done to avoid delay. And with that, I'll save my time for rebuttal. Thank you. Thank you very much, sir. Mr. Tao?  Good to have you here, sir. Pleasure to be here. Your Honors, may it please the Court, my name is Sam Towle, Deputy Attorney General of the Commonwealth of Virginia, here on behalf of the University of Mary Washington and former President Hurley. The question in this case, Your Honors, is whether a university may be subject to liability for money damages under Title IX for the anonymous statements of others on a now-defunct third-party social media platform that the university does not use and over which the university has no control. Can I ask you a question about that? Certainly, Your Honor. Again, I want to make sure I understand sort of the structure of your argument. Your position is that there was not sufficient control over the students or the context here to give rise to liability. And that would be true even if the school had done nothing, even if the school had been deliberately indifferent, because there's no obligation to respond if you have no control over it, right? That is correct, Your Honor. So you are saying basically, per se rule, under Title IX, there is no liability for damages for cyber harassment, as long as the posts are anonymous? Well, Your Honors, I think the context does matter. How so? I read your brief to be saying if it's in the air, if it's cyberspace and it's anonymous, the school does not have control over it. That means, period, there can be no liability under Title IX. It would have been fine if the school in this case had said to these women, go away. Well, Your Honor, I think that is a direction that the court could take in this case. But you are urging us to take that position in your brief, correct? That is a position, yes, Your Honor. Okay. Can you explain to me why that is correct? Well, certainly, Your Honor. In order to have liability under Title IX, under the controlling Supreme Court precedent in Davis, there must be not only control but substantial control, of course, over both the alleged harassers and the context in which that harassment occurred. Okay. Let's start with the harassers. So the district court said you could reasonably infer that the harassers in this case were students. And as I read Davis, Davis is saying if they're students, you have control. Well, I don't believe that it can be quite that level of abstraction, Your Honor. And certainly that is what the student appellants argue in this case, is that the first prong control over the alleged harassers and they are students and, therefore, that prong has been satisfied. But Davis itself deals with peer-on-peer harassment. And so every case under Davis is going to involve students. But we know that this was a student case, too. At least it can be reasonably inferred from the complaint. So why isn't this just a Davis case? Certainly, Your Honor. But the inquiry must be more searching than just simply saying students because that's all that Davis applies to in any event. And when the court indicates that you must demonstrate that you have substantial control over the alleged harassers, simply saying that they are students is not going to be sufficient. Why wasn't there substantial control over the students who were sending these messages?  So are you saying that there's no obligation? If this had happened, if one of these harassers had, you know, grabbed a woman on campus, say all of them were literally grabbing women as they walked to and from classrooms, but they had like a mask on, there's no control. You don't even get to deliver anything. Well, Your Honor, I certainly believe that there's a spectrum of potential harassment that is applicable in these types of circumstances. Why would it make any difference? Like you just said, if they're anonymous, if the school doesn't know who they are, there's no control. We don't even get to the sort of fact-specific deliberate indifference inquiry. Well, I do not know, Your Honor, that anonymity itself is necessarily the end of the inquiry of determining whether or not there could potentially be control in certain circumstances. But certainly in the cyber context, anonymity takes on an even greater degree of, for lack of a better word, anonymity and difficulty in identifying individuals. And it also means that all of the activity about which we are discussing is speech activity, unlike in your example, Your Honor, where there is physical harassment that is an issue. I totally understand how the fact that the students are anonymous and it's coming over yik-yak. I see why all of that might go toward deliberate indifference. And what does the school have to do that would count as reasonable? But I don't understand, and I will let this go in a minute, but it's just not clear to me why that means the school doesn't have control over what's happening on its campus to these women. I mean, would it make a difference if they had taken everything that was in these posts and put them on posters and anonymously hung them up on campus? Would you say there's no control there so we don't even get to deliberate indifference? I think, Your Honor, there could potentially be a different level of control because the university certainly has more control. What sort of binary? Is there control or not? Do we even get to deliberate indifference? So would the school have control, anonymous posters hung up on campus? Well, Your Honor, I'd like to answer that in two phrases because you initially indicated that control is binary, but Davis instructs that there is liability to a university only when there is substantial control. Yes or no, substantial control. So that there must be at least some sort of spectrum of control. I don't believe that it being entirely binary is the analysis that's been set forth by the Supreme Court. But to your point about the posters, one of the differences in that aspect is, of course, the university does have... So can you just say yes or no, would there be substantial control? In that circumstance, there may, in fact, there may be substantial control. Okay, and this one is different because the stuff is up in the air and not on the walls? Not just that, Your Honor, but it's on a third-party social media platform. That is not the university itself. It is a device, an application that individuals can download onto their phones if they so choose in order to interact with other individuals who have that same application. That is fundamentally different and an important part of the context in this case. If it were, this is my last question, I promise. I really am trying to get my hands around this control thing because it does seem to me you're asking for sort of blanket immunity for cyberspace. And I just want to make sure, before we even get to deliberate indifference, I want to make sure I understand the scope of that kind of immunity. If it were, I know this is going to sound crazy, but I want to take kind of the property rights, the posters hanging on university walls out of aggression. What if it were one of those airplanes that pulls the banners behind it and it was flying back and forth over the campus? So not on campus property, but it's the content of these posts is being flown back and forth over campus where the women have to see it every day. It's affecting their experience on campus. It's done by students, anonymous students. Does the university have control over that, or could it just say not a problem? Well, Your Honor, that is certainly a different question. I'm trying to answer your question as best I can. It seems really similar. It's the stuff in the air. Certainly, and that is, of course, exposed to everybody. But you could identify the airplane. Excuse me? You could identify the airplane. That's right, Your Honor. And the circumstances are also different in that it is not only those individuals that are using this third-party application who have elected to download this application and use this application. Air writing, of course, would presumably be visible to the entire campus. So the circumstances, of course, are different. So there would be substantial control over that one? Your Honor, in those circumstances, I just don't know that there is substantial control over a skywriter. Okay. But that goes both to substantial control over the individuals and, again, the context in which the harassment occurred. So even in that case, Your Honor, does the university have substantial control over an anonymous student's ability to get a plane to engage in speech activities above the university is yet another element that would need to be addressed in order for there to be liability. This is, I promise, my very last question on this control thing. We have this case wall scheme. Yes, Your Honor. Right, where we sort of address this question metaphysically. Where does speech occur if it happens on the Internet? And we said that if it is aimed at students and the impact is felt on campus and it's intended to be felt on campus, that's enough to give it a nexus to school operations and programs so that it can be punished under Tinker. And I'm wondering why that case doesn't sort of bear on this one, doesn't suggest that wherever this stuff kind of lives metaphysically, if it's aimed at campus, if it's intended to be felt on campus, that's enough to call it campus speech. Your Honor, I think one of the most important differences in the Kowalski case is that that involves the K-12 context. Oh. And here we're, of course, in the university context. And Davis is clear that there are greater expectations on the administration. But that goes to deliberate indifference. That's the part where Davis is talking about deliberate indifference. And I absolutely understand that what is reasonable in terms of a response. Again, that's all that very fact-specific deliberate indifference inquiry. But you're saying we don't even get there. We don't even have to ask whether the school responded appropriately because this was just none of their problem. And so your suggestion, so now you're saying exact same facts if they happen in a high school, that triggers a deliberate indifference inquiry. But if it happens at a university, it doesn't under Kowalski. Your Honor, I think it, again, goes to the level of substantial control over which the administration has over the student population. And that is an important difference between Kowalski and the case here because in that case, we're talking about high school students in a high school context. And maybe the students. Yes, sir. That as well. Do you agree with me, Doctor, that the university has a substantial degree of interest in protecting the safety of its students? Certainly, Your Honor. But you do take the position, I think, that the anonymous threats of violence against students over the Internet are constitutionally protected? Well, Your Honor, I think it's important to recognize that the university has broad discretion in how to handle these situations of sexual harassment. And in this case, it is important, I think, to recognize the scope of the university's responses in different circumstances. But do you take the position that anonymous threats of violence, like this here rape and murder against female students, are constitutionally protected over this IPCAP operation on the Internet system, up in the cyber world? Well, Your Honor, I don't believe that, as pled in the complaint, we do not have any true threats under Virginia v. Black. The one situation in which an individual student was identified in a circumstance in which an anonymous poster stated, I am going to confront this person at this place at this time. What did the university do in that circumstance? They ensured that a campus police officer accompanied that young woman to ensure her safety. So the university is taking the appropriate steps in different circumstances in order to address this harassment. Well, if you don't take that position, Your Honor, would you instead agree with our decision in a case called Bly, that threats of violence are not constitutionally protected by the First Amendment? Don't you have some obligation to try to identify who's making the threats? I mean, you've got a crime on your hands. It's like the bank robber got away. All you've got to do is find him. You've got somebody making threats of violence against students. They're anonymous. What can be done to take off the mask, to identify them? Don't you have to do something to try to do that, to identify the criminal? It's what you've got if these are valid threats, actual threats of violence against students at Mary Worcester University. Then you've got allegations in this complaint that crimes are being committed. What are you going to do about it? There is nothing because it's the First Amendment. Your Honor, I don't believe that is accurate because what the university has done in a number of occasions is inform the student body through campus-wide communications that if an individual does feel that his or her safety is threatened, that they should contact the Title IX office and that they should contact the authorities or the campus police in any of those circumstances. That is how we know that a campus police officer did respond in one of those circumstances. There are cases that indicate that directing students to those resources that can provide them protection in those circumstances in which the university may not be able to is sufficient to satisfy the analysis under Davis. And to your point, Judge Agee, in discussing this matter with the appellants, the university has hardly been deliberately indifferent in this case. They have been deliberately engaged. How do we know what they've done? We don't have a record. The appendix here is smaller than any of the briefs. Every brief that's filed is bigger than the appendix. Thicker than the appendix. Well, Your Honor, there's been no discovery. You filed no affidavits, I don't think. You filed a motion that was two paragraphs long. And you all briefed it and there's not an appendix. We don't have anything in the record except a complaint and a two-paragraph motion. A complaint that has over 100 paragraphs worth of allegations and many of which, even taken in the light most favorable to the non-moving party, nevertheless demonstrate that the University of Mary Washington was not deliberately indifferent in this circumstance. It's to the appellant's credit in this case that they did set forth a fulsome description of the activities about which they complained as well as the response of the university in a number of those instances. On pages 19 and 20 of the appellee's brief, there are nine individual actions that were taken by the university in response to the complaints of the students. And Davis is clear that complainants may not demand a particular form of remedy. And time and again, that is what these individual complainants demanded. They demanded that the university reach out to Yik Yak and have Yik Yak shut its application down on the University of Mary Washington. They demanded that the University of Mary Washington disable or disallow Yik Yak from using the school's Wi-Fi system. An entire speech forum, which indeed includes derogatory speech in this context, but is a speech forum nonetheless. And the university has the discretion not to expose itself to potential First Amendment liability in order to respond to complainants in the way that they would potentially prefer. But time and again, the university engaged with the student complainants. Did the university get a legal opinion to back up what it did? The university, and it is in the complaint, engaged with experts to determine what actions it may be able to take within the bounds of the First Amendment without potentially exposing it to First Amendment liability. And a university, again, it needs that broad discretion in order to sail between the skill of Title IX liability and the career business of Title IX. Did those lawyers tell the university that threats of violence were not protected by the Constitution? But, Your Honor, even if that is the case, did the lawyers tell them that threats of violence were not protected by the Constitution, by the First Amendment, or any part of the Constitution? Well, Your Honor, I'm not comfortable responding to that question because of attorney-client privilege. That's the law, I think. Do you agree with this? In certain circumstances, true threats, yes, are not protected by the First Amendment. That's correct, Your Honor. But in this circumstance, we do not have any true threats directed toward any individual. So you're back to saying there aren't any threats. So there we go. We need to analyze the complaint to see if any of these yik-yak things, anonymously they are, are true threats. I thought you accepted that proposition. Well, Your Honor, I think, again, and this is a, if the last two years have taught us nothing, it's that not all anonymous speech in the First Amendment context is in the same vein as Publius in the Federalist Papers. There is a lot of politically protected speech that can be quite derogatory. But in this case, as in other cases, that does not mean that it has not enjoyed some level of First Amendment protection. And in this case, each instance in which there is a spike in derogatory comments, it is in response to the advocacy, commendable though it is by the students that took part in it, against those individuals because of the political positions that they have adopted. Well, the President characterized what they said as false. Your Honor, the issue that the President identified in his letter is the… Is that letter part of this record? It's in the Joint Appendix. Is it proper to consider that letter as far as the Attorney General is concerned? I believe so, Your Honor. It's certainly referred to in the complaint. It's not in the complaint, but it's referred to in the complaint. That's correct, Your Honor. Okay. And did you all agree to put it in the record? I know it's in the appendix. It's in the Joint Appendix, yes. I noticed it was placed in the record in the District Court. Or did you all just stick it in the appendix here? Your Honor, I did not handle the case below, and I apologize for not knowing the answer to that at this stage. Okay. But clearly, your position is properly considered by us as experts of people. I believe so, Your Honor, because it is directly addressed in the complaint. And, Your Honor, to your point about the statements made by the University President in that context, he was discussing the statements made in the OCR complaint that seems to suggest a connection between the murder of a University of Mary Washington student and the posts on Yik-Yak. And that was the issue, and that was the aspect about which he took issue, using the language that you described. Was this the same letter where he said it's important to put the posts in context? That's correct, Your Honor. Can I ask you a question about the advocacy? You mentioned that the women who were the victims of this harassment were politically active, and I did notice that in the brief you refer to them throughout as the activists, the activists in the political fray. They continue their outspoken advocacy. They complain. They object. Is there some legal relevance to the fact that they were politically active on campus? Does that change anything about the law here? Your Honor, I think it's important for the analysis of the First Amendment liability piece because these students, again, commendably are engaged on issues of sexual harassment, and they are outspoken in that. Oh, I'm sorry, Your Honor. I see that my time has expired. May I please respond to your question? Thank you. Well, she's asking good questions. Anybody else, you keep answering them. Thank you, sir. In that context, they are, and again, commendably so, engaged on the issues of the day, and in those circumstances, there are people, especially people that hide behind the shield of anonymity, that do not necessarily hold those same views. And the university has to be cognizant of that particular context in determining whether or not there are potential First Amendment liability pitfalls for them should they elect to take some kind of action against people making those statements. Now, Your Honor, I agree that the statements that are at issue here are certainly odious, and that is why the university took a number of steps that it believed that it could to attempt to address this harassment. There are parts of your brief where you say there are adults who intentionally and voluntarily entered into the political arena to weigh in, advocate for or against issues related to gender, and striking a blow for one's cause. It should be unsurprising that others may seek to answer back. And there's a suggestion almost that the women here are kind of coming to the nuisance. Like, what do you expect? You start doing stuff like this. But that's not the argument you're making. I'm perhaps over-reading my brief. Yes, Your Honor. I do think it's important to know that these are adults, and they are engaging in the political arena on meaningful issues, which is exactly what we want our young men and women and universities to do. But we cannot have the university be a surety or a guarantor with respect to money damages if other individuals who don't hold those views express their opposition, even when they do so particularly odiously, as they have done in this context. But even if they do so in a form, I mean, you're not arguing that this was not sufficiently severe and pervasive to deny these women full access to their educational opportunities, right? You're not making that argument. Your Honor, I am not making that argument in this particular context, although I would be concerned about potentially conceding that if this case goes on forward below. Well, you didn't argue it, so I think you've conceded it. Right? I mean, you've waived it. It's not in your brief. In what sense do you think? I don't know. I'm sort of surprised at your answer. Your Honor, I'm just trying to be cautious about not waiving things in the oral argument. Okay. But you agree it's not anywhere in your brief. You have not appealed on that ground. That is correct. Okay. But we have not appealed this case at all. I'm sorry. You have not defended the appeal on that ground, right? Thank you, Your Honor. Thank you, Mr. Stout. Appreciate it. Professor? Professor? Ultimately, this case comes down to the question, does a campus have any duty to deal with anonymous threats, harassment over cyberspace? I think there's two questions that I want to focus on. First, were there true threats and harassment in this case? And second, was there deliberate indifference when you compare what the campus did compared to what it should have done? As to the former, I think counsel understates the record. There were threats here. I directed to paragraph 46 on page 15 of the joint appendix, and I'm quoting here. I'm going to tie those feminists to the radiator and grape them in the mouth. Quote, Dandy's about to kill a bitch or two. Can't we euthanize whoever caused this? Or if you also look on paragraph 49, page 25 of the joint appendix, the letter that was written to the president and the tunnel 9 advisor. We've been threatened with both physical and sexual violence and have had countless derogatory misogynistic threats directed at us, mostly through social media. These are not just a few threats. Counting only a little documents from the past two weeks, we have 200 examples of students using Yik Yak to post either violent, patriotic hate or threats against us. As you point out, Judge King, this is not a motion to dismiss. We believe that it should be able to go to discovery and summary judgment. The fact that this was done anonymously doesn't make it protected by the First Amendment. If these were bomb threats, as I said, Judge Agee, the campus would have found out who did it. The campus had the obligation here. The fact that it's speech doesn't end the inquiry, because as you said, Judge King, true threats and harassment aren't protected by the First Amendment. So that leads to the second question, what the case is really all about. Was there deliberate indifference when you compare what the campus did to what it should have done? Now, the attorney for the state says the campus did nine things. Judge Agee, you began by pointing them out. But I ask you to look at them individually. What happened here? Well, the professor organized sharing circles so the students could express their feelings. Also, the campus said that it wasn't going to be able to take any action because this was cyber bullying and this was speech. The campus on one instance called a police officer to be present. And the only other thing the campus did was say, well, the students could file complaints with Yik Yak University. That's it. And that's deliberate indifference when you compare it to what the campus should have done. Even apart from speech, I said the campus should have condemned the harassment. The campus should have condemned the threats. Judge Agee, you pointed the statement to the president of the university. They canned the rugby team, forced him to go through mandatory training. Does that not count for anything? Well, but, Your Honor, that happened almost at the very beginning of this before the threats and harassment. The statement that you mentioned was up here before from the president of the university was in the context of the rugby team. Canning the rugby team triggered a great deal of the threats and harassment that followed. Hundreds more messages. And at this point, the campus did nothing. It is the indifference at that stage that violates Title IX and equal protection. Also, the campus, as I said, could have tried to find out who were making the threats. They would have done this if there was bomb threats. The campus could have and should have provided counseling with the students. The campus could have and should have provided training for administrators and faculty and students. The campus should have adopted a cyber-bullying policy, and it didn't do that. Judge King, a couple of times you've mentioned advice of counsel. I don't remember seeing that in the complaint or anywhere in the record, and I think that's quite important. It may be referred once in the complaint, but I specifically recall it being in that letter. That's the reason I asked you about the letter, whether it was part of the record or not. But the president in that letter talks about consulting with counsel. But, of course, this is on the motion to dismiss, and there's nothing in the complaint letter. No, it is, but the letter is referred to in the complaint. And the letter is there, and, in fact, we argue that the letter is part of the retaliation that occurred here. Do you know whether the letter is part of the record in the district court? It was attached to the materials that were before the district court. It was not attached to the complaint? It was not attached to the complaint, to my knowledge, no. We'll figure it out. But I think the key is there's not nearly enough for this court to know what advice of counsel was sought and what it meant for it to negate the allegations of deliberate indifference. And I want to conclude, Judge Harris, with where you went to. The argument that's made by the state in its brief that the attorney of the state did make here, saying that these students entered the fray by making comments, they certainly subjected themselves to being part of the debate. And there could have been a debate over whether it was appropriate to spend the rugby team. There could have been a debate over what campus cyber policy should be. But that doesn't mean that they're subjecting themselves to threats of rape, threats of murder, and harassment. That's like saying that when a woman goes to work in a workplace, she's subjecting herself to the possibility of sexual harassment. This court and every court has rejected that argument. This case is so important because the question is, does the campus have any duty to protect the students from cyber bullying, harassment, and threats? And the answer to that question has to be yes. Thank you. Thank you very much. Thank you. We'll come down and read counsel, and then we'll call the next case.
judges: Robert B. King, G. Steven Agee, Pamela A. Harris